FELICE JOHN VITI, Acting United States Attorney (#7007)
MARK E. WOOLF, Assistant United States Attorney (WA #39399)
JENNIFER E. GULLY, Assistant United States Attorney (#15453)
BRIAN WILLIAMS, Assistant United States Attorney (#10779)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>JEREMIAH JOSEPH EVANS<br>a/k/a "The Bull,"<br><br>　　　　Defendant. | Case No. 2:24-cr-00374-DS<br><br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br><br><br>Judge Tena Campbell |

Consistent with the parties' plea agreement entered pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States of America ("United States") recommends a custodial sentence of 96 months, a restitution order in the amount of $19,150,150, and three years of supervised release for the Defendant Jeremiah Joseph Evans ("Evans"). The United States' recommendation is authorized by statute, grounded in the United States Sentencing Commission's Guidelines Manual ("Guidelines Manual"), and justified by the factors the court must consider under 18 U.S.C. § 3553(a).

I.　Procedural Background

On January 21, 2025, a two-count Felony Information was filed against Evans charging him with Securities Fraud in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5

and Money Laundering in violation 18 U.S.C. § 1957. *See* ECF No. 1. On January 23, 2025, Evans made his initial appearance before United States Magistrate Judge Daphne A. Oberg and pled guilty to the Felony Information. *See* ECF Nos. 9, 12. Evans was released on conditions. *See* ECF No. 10.

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to recommend a custodial sentence within a range of 60-96 months, full restitution, and a forfeiture money judgment.[1] *See* ECF No. 12 at ¶¶ 12(b), 12(f), and 12(g). The United States further recommends that Evans' custodial term be followed by three years of supervised release. *See* Presentence Investigation Report ("PSR") at ¶¶ 78-80.

## II. Factual Background

The PSR accurately sets forth the offense and other relevant conduct. *See* PSR at 8-17. For a period of approximately three years, Evans organized and led an investment scheme through his company Alpha Influence, LLC ("Alpha"). The Alpha scheme involved the sale of securities contracts for "Alpha Automated Stores," which Evans aggressively promoted through social media, as "fully managed and automated" Amazon dropshipping stores that would generate life-changing passive income for investors exclusively through the efforts of the "Alpha Influence Team." Evans exercised near total control over the coordinated narrative between Alpha and purchasing investors, a narrative built almost exclusively on falsehoods, material misrepresentations, and critical omissions. *See* ECF No. 12 at ¶ 11(b)(i)-(xi).

In his role as organizer and leader of Alpha, Evans engaged approximately 67 individuals who received commissions (from investor funds) for selling the Alpha investment. These sales agents were generally organized into sales teams under individuals known as "Alpha Team

---

[1] The United States will no longer be seeking a forfeiture money judgment.

Leads," who met regularly with Evans for discussion and training on selling the Alpha investment. Neither Evans nor any member of his sales team were licensed to sell securities.

Evans' success in selling the Alpha investment was life-changing—for Evans. Promoting the evidence of Alpha's success through a brash online persona, Evans flooded social media with his lavish lifestyle. Evans did not limit his promotion to the online space, expanding his efforts to workshops, podcasts, and a once-in-a-lifetime conference dubbed "AlphaCon." The Alpha investment scheme eventually collapsed, but not before tremendous damage was done. The Alpha investment was purchased by approximately 530 individual victims resulting in a total loss of just under $21 million.

### III.     Sentencing Guidelines

Sentencing proceedings start with correctly calculated sentencing guidelines. *See e.g., United States v. Rosales-Miranda*, 755 F.3d 1253, 1259 (10th Cir. 2014) (citation omitted). Congress created and charged the United States Sentencing Commission with developing guidelines that reflect the objectives of 18 U.S.C. § 3553(a). *See* 28 U.S.C. § 991(a) and (b). The result, as reflected in the Guidelines Manual, is a "rough approximation," in the aggregate, of how to determine sentence lengths that may achieve those § 3553(a) objectives based on the nature of the criminal conduct itself and an individual's criminal history score. *See e.g., Rita v. United States*, 551 U.S. 338, 349-350 (2007). While the sentencing guidelines represent a collective wisdom that provides a good starting point to evaluate § 3553(a)'s objectives, *see e.g. United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2008), the calculated guideline range remains advisory and is just one factor among several for the sentencing court's consideration in imposing a sentence that is "sufficient, but not greater than necessary" to achieve the objectives of § 3553.

The United States Probation Office has correctly calculated the sentencing guideline range at 135-168 months based on a total offense level of 33 and criminal history category I. *See* PSR at ¶ 73. The primary drivers of the guideline range are (1) the loss for the entire Alpha investment scheme, (2) the substantial financial hardship caused to victims, and (3) Evans' role as the organizer and leader of Alpha. *See* PSR at ¶¶ 27, 28, and 30.

**IV.    Sentencing Recommendation and Discussion of 3553(a) Factors**

Generally, the guideline range places an individual defendant with other similarly situated defendants. However, the sentencing court must still examine the relevant § 3553(a) factors within the context of defendant-specific information to reach a fair and just sentence. Here, the parties are recommending a sentencing range that is consistent with a balanced analysis of the calculated guideline range, the § 3553(a) factors, and other available information relevant to the court's consideration.

**A.    *The Nature and Circumstances of the Offense***

The nature and circumstances of Evans' offenses are egregious. Evans engaged in a lengthy affinity fraud scheme targeting and exploiting his network of friends, family, and associates with the illusory promise of riches premised on a bulwark of lies. Affinity fraud schemes are all too common and disproportionately impact Utahns. The Alpha investment scheme follows a similar pattern to other affinity fraud schemes and is notable for its simplicity while simultaneously shocking in its audacity.

///

///

///

///

1. *"I'm the fucking king!"*

"No one will ever, ever tell me what to do. I live a life of freedom because I don't care what regulations come out of this country. I don't care what they try to do. You can't fucking tell me what to do. *I'm the fucking king*!"

– Jeremiah "The Bull" Evans, AlphaCon, February 2022.

There is perhaps no better encapsulation of the Alpha investment scheme than Evans' proclamation at the now-infamous February 2022 AlphaCon conference that he was the "fucking king." Throughout the course of the scheme, Evans relentlessly promoted a larger-than-life persona. This self-promotion was critical in his effort to induce victims. It worked to great effect through the evolving landscape of social media, where Evans' admitted conduct puts into sharp relief a common tactic used by fraudsters — generating the "Fear of Missing Out" or FOMO.

FOMO is hardly new. Evans, like others before him, created and presented information demonstrating how an investment could change the lives of potential investors just like it had his. He did this primarily through carefully curated online content targeting his network of friends and followers with the version of FOMO he wanted them to see—exotic trips, private jets, swanky parties, luxury goods, social access, fancy cars, and any other material accoutrement that Evans associated with success.

   

 

Evans' erudite investment cosplay was not limited to curated FOMO. He also used his social media platform and investment fraud largesse to offer up "advice" to his followers. There is no shortage of "experts" in the online space who are willing to sell you a bigger nickel in exchange for a smaller dime, but Evans' "advice" stands out:

> "You have to actually spend money on yourself to validate yourself. . . . Pat yourself on the back for what you've accomplished."
>
> "When I hit a landmark I celebrate. I buy something expensive. I go on a trip. I take my team on trips to Vegas."
>
> "Saving money is the worst thing you can do. You need to invest in yourself. You need to invest in your energy, your emotional state of being, and making sure you're up and you're proud of what you're doing . . . . You have to enjoy the journey. So spend money ... treat yourself when you hit certain things because you have to make the journey worth it. And that's what it's all about."

This "advice," when viewed in the overall context of his fraud scheme, makes sense. It is always easier to spend other people's money.

///

///

///

///

6

2. *The Investment*



The Alpha investment scheme was not dissimilar to other schemes in that there was a kernel of truth—you can invest in an Amazon dropshipping store. Evans capitalized on this kernel by offering investment contracts promising passive income and a jumpstart to generational wealth through Alpha. It was pitched as an essentially fool-proof alternative to a traditional business that would generate (1) thousands of dollars in consistent passive monthly income, (2) a full return on the initial investment in a short period of time, (3) with no effort beyond providing initial capital for the investor.



In pitching the Alpha investment, Evans made knowingly false and fraudulent representations of material fact to potential investors. Alpha had not been operating successfully at all, let alone for years. *See* ECF No. 12 at ¶ 11(b)(i).  Alpha never generated consistent, predictable monthly returns for its investors. *Id.* at ¶ 11(b)(ii). Representations to investors that any problems could be swiftly dealt with because of Evans' deep business connections at Amazon were fabricated. *Id.* at ¶11(b)(v). Claims of a "legal team" that would be deployed for investors were also false. *Id.* at ¶ 11(b)(vii).



As the Alpha scheme progressed, Evans' online content taunted victims as complaints mounted. Evans largely ignored those complaints choosing instead to double down and press forward with continued false information regarding investment success. *Id.* ¶¶ 11(b)(ix).  Evans even supported that purported success with

testimonials that he failed to disclose were offered by his family members and others whose only "success" was through commissions they received for selling the fraudulent investment, not profits from stores managed by Alpha.[2]



### 3. The Money

Capturing the entirety of the materially false and misleading information provided to investors in this memorandum would be difficult because of the sheer volume. Like most fraudulent investment schemes, however, the primary purpose was to obtain and spend investor funds for personal gain.

To that end, Evans has also pled guilty to Count 2 of the Felony Information, a § 1957 money laundering charge for the wire of $50,000 toward the purchase of a Lamborghini Huracan Evo. This was far from the only incident where Evans improperly spent investor funds. Indeed, recalling Evans' investment "advice" to *"spend money on yourself to validate yourself,"* there

---

[2] The names of individuals providing testimonials have been redacted, except for Kole Brimhall and Dallin Pili who have both been charged for their role in the Alpha Scheme. *See United States v. Brimhall*, Case No. 2:24-cr-00374-DS, and *United States v. Pili*, Case No. 2:24-cr-00390-HCN.

can be no debate that he put victims' money where his mouth was with a dizzying array of luxury purchases.

| Date | Description | Amount |
|---|---|---|
| 07/30 | 07/30 Online Domestic Wire Transfer Via: Key Bk UT [redacted] A/C: Salt Lake City Motorcars South Jordan UT 84095 US Ref: Down Payment For White Huracan Evo Imad: 0730B1Qgc04C003756 Trn: 3018031211Es | 45,000.00 |
| 08/18 | 08/18 Online Domestic Wire Transfer Via: Key Bk UT [redacted] A/C: Salt Lake City Motorcars South Jordan UT 84095 US Ref: Envision Car Wrap Imad: 0818B1Qgc06C013844 Trn: 3323831230Es | 16,087.50 |
| 06/01 | 06/01 Online Domestic Wire Transfer Via: First United [redacted] A/C: Gentleman Timepieces LLC Dallas TX 75201 US Ref: Submariner Imad: 0601B1Qgc05C006062 Trn: 3328371152Es | 14,608.25 |
| 01/19 | 01/19 Online Domestic Wire Transfer A/C: Gentleman Timepieces, Limited Dallas TX 75204-8600 US Ref: Three Rolexes Trn: 3074252019Es | 32,500.00 |
| 07/27 | 07/27 Online Domestic Wire Transfer A/C: Gentleman Timepieces, Limited Dallas TX 75201-6978 US Ref: Submariner And Datejust Trn: 3065801208Es | 25,000.00 |
| 10/08 | 10/08 Domestic Wire Transfer Via: Wells Fargo [redacted] Ref./Time/15:42 Imad: 1008B1Qgc05C008334 Trn: 3466831281Es | 140,000.00 |
| 10/14 | 10/14 Online Domestic Wire Transfer Via: Wells Fargo [redacted] US Ref: The Bulls Truck/Time/05:05 Imad: 1014B1Qgc05C000941 Trn: 3082521287Es | 22,500.00 |
| 12/08 | 12/08 Online Domestic Wire Transfer Via: Wells Fargo [redacted] US Ref: The Bulls Truck/Time/08:00 Imad: 1208B1Qgc05C001447 Trn: 3027301342Es | 17,000.00 |
| 10/19 | 10/19 Domestic Wire Transfer Via: Glacier Alta [redacted] Makes & Models, LLC Imad: 1019B1Qgc05C023051 Trn: 3310891292Es | 144,071.06 |
| 08/03 | 08/03 Online Domestic Wire Transfer Via: Key Bk UT [redacted] A/C: Salt Lake City Motorcars South Jordan UT 84095 US Ref: Gmc 1500 Imad: 0803B1Qgc03C001887 Trn: 3051341215Es | 48,665.00 |
| 09/15 | 09/15 Domestic Wire Transfer Via: Fortis Private [redacted] National Title Agency of Utah, Inc Ref: Attn [redacted] Jeremiah [redacted] Evansescrow #: 21-4578Ab Imad: 0915B1Qgc07C018949 Trn: 3455931258Es | 161,679.00 |

4. *The Impact*

The Alpha investment scheme left financial devastation in its wake. Approximately 530 victims invested just under $21 million. Monetary loss and a defendant's role in a scheme

generally drive the guidelines calculation, but victim losses extend beyond money, and these uncaptured losses can have life-altering impacts for victims long after a scheme ends.

Perhaps the most obvious uncaptured loss is a debilitating loss of trust, which makes sense given the uniquely predatory nature of affinity fraud schemes where a victim's trust is exploited. Here, victims have repeatedly used phrases like "we went to school together," "we sat in the same pew," "I played football with him," or "he was like family." Loss of trust does not stop at familiarity's door. Several victims have also indicated that this experience has left them questioning whether they will ever invest again.

Another strong undercurrent is victim expressions of shame. Hindsight is always 20/20, and it is easy for victims and others to look back and identify what may appear to be obvious red flags. This scheme was not complex in design, but it was painstakingly and carefully executed. Its presentation was convincing enough that, during the height of its impact, a legitimate news source asked whether Evans was the next Tony Robbins.[3] Nevertheless, shame for victims persists.

Investing with Alpha came at a steep price. Most of the victims were not sophisticated investors or financially able to immediately absorb the loss, if at all. The financial setbacks for the disabled nurse seeking a form of passive income after receiving the diagnosis that he was going blind, the high school teacher and football coach looking to supplement his pay, or the recently divorced single mother fighting to make ends meet for her and her children were significant and lasting. These stories are not unique amongst Evans' victims.

///

///

---

[3] https://www.abc4.com/news/the-next-tony-robbins-jeremiah-the-bull-evans-on-jessops-journal/

B.  *The History and Characteristics of the Defendant*

The picture presented by Evans to the public and investors through his brash public persona may be fairly characterized as soaked in hubris and dripping with insecurity. But, the Evans who has met with the United States on multiple occasions stands in stark contrast. He has been measured, cooperative, humble, and penitent. He also took immediate responsibility for his conduct, which provides a measure of closure for victims without the retraumatizing effect of trial.

Further, Evans was in his mid-20s during the scheme and, at the time of sentencing, will be just 29 years old. The guidelines recognize a defendant's youthfulness as a relevant consideration in determining whether a departure from the guidelines is warranted. *See* USSG § 5H1.1. Evans also has a young family, which means he will miss moments he cannot get back while he serves his custodial term. Nevertheless, his family remains supportive.

Evans is in good physical condition, does not have a history of substance abuse, has no criminal history, and, according to the PSR, does not display symptoms suggesting serious emotional problems. The United States' meetings with Evans have left little doubt that he has marketable skills and a desire to succeed that should serve him well upon release. His entrepreneurial spirit is commendable, and the United States wants him to succeed in his entrepreneurial pursuits informed, of course, by the law and his obligation to repay victims.

C.  *Promote Respect for the Law, Provide Just Punishment, Ensure Deterrence, and Protect the Public*

Evans' conduct merits a significant custodial sentence. The recommended sentencing range of 60-96 months provides just that, promoting respect for the law and providing just punishment while also accounting for Evans' cooperation, youth, and lack of criminal history. A sentence within the agreed range also ensures general and specific deterrence. There is general

11

deterrence in the certainty of a custodial term, and Evans' history suggests that he is unlikely to reoffend. Even so, a three-year term of supervised release will allow for Evans to reintegrate and rebuild in a positive manner upon release. *See* PSR at ¶¶ 78-80.

## V.     Restitution

The court must consider "the need to provide restitution to any victims of the offense," *see* 18 U.S.C. § 3553(a)(7), and here restitution is mandatory pursuant to 18 U.S.C. § 3663A. The principal aim of restitution is to ensure victims are, to the extent possible, made whole for their losses. *See e.g., United States v. Ferdman*, 779 F.3d 1129, 1132 (10th Cir. 2015) (citations omitted). Courts are afforded a wide degree of latitude in determining restitution and should not simply rubber stamp unverifiable claims of loss. *Id.* at 1133. Exact precision is not required, but neither speculation nor rough justice is permitted. *Id.*

The United States has calculated restitution within the constraints of the applicable legal requirements at $19,150,150—the combined total of the verifiable initial investment price for the approximately 530 purchasers of the Alpha investment.[4] Evans will be jointly and severally liable with the defendants in *United States v. Kole Brimhall*, Case No. 2:24-cr-00374-DS, and *United States v. Dallin Pili*, Case No. 2:24-cr-00390-HCN. *See* 18 U.S.C. §§ 3664(d), 3664(h).[5]

---

[4] As noted previously, Evans engaged approximately 67 individuals who received commissions from selling the Alpha investment. Several of these individuals are also identified as victims. The United States has offset restitution for those victims who also sold the investment by the value of commissions they received. For example, if a victim purchased the Alpha investment for $40,000 and also received $10,000 in commissions for selling the investment, then the victim's restitution is $30,000.

[5] The United States is not aware of any assets held by Evans that can be liquidated and paid at this time. A restitution judgment, however, results in a powerful lien "in favor of the United States on all property and rights to property of the person[.]" *See* 18 U.S.C. § 3613(c). The United States will use its best efforts to enforce the restitution judgment and lien moving forward.

## VI. Forfeiture

The United States is no longer seeking a forfeiture money judgment.

## VII. Conclusion

Based on the foregoing, the United States respectfully requests that the court accept the parties Fed. R. Crim. P. 11(c)(1)(C) plea agreement. The United States asserts that a custodial sentence of 96 months is sufficient, but not greater than necessary, to effectuate the purposes of sentencing. The United States further requests that the court enter a restitution order in the amount of $19,150,150 and impose three years of supervised release. The United States is not asking that Evans be taken into custody at sentencing. He should be maintained on his current conditions and permitted to self-report.

DATED this 1st day of May, 2025.

FELICE JOHN VITI
Acting United States Attorney

/s/Mark E. Woolf
MARK E. WOOLF
Assistant United States Attorney